Filed 4/29/26  In re A.J. CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.J., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY J.,<br><br>    Defendant and Appellant. | A174548<br><br>(Contra Costa County Super. Ct. No. J24-00122) |

Anthony J. (Father) appeals from orders terminating his reunification services and limiting his right to make educational decisions, which the juvenile court issued following a contested 18-month permanency review hearing for his son, A.J. (Minor).  Father argues he did not receive reasonable services, he should receive services for an additional six months, and the juvenile court abused its discretion in terminating his education rights.

We affirm.

## FACTS AND PROCEDURAL HISTORY

*Background*

Father lives in Washington state.  Minor was born in 2019 and has never lived with Father.  Before this dependency case, Minor's mother

1

(Mother) was his custodial parent. Minor did not have any attachment to, or bond with, Father and did not know him to be his father, and Father never openly held Minor out as his own. In October 2020, Father was ordered to pay child support by the Washington State Division of Child Support, and Father contested the validity of the child support case for years.

*Current Juvenile Dependency Proceedings*

<u>Dependency Petition Filed, March 2024</u>

On March 1, 2024, the Contra Costa County Children and Family Services Bureau (Bureau) filed a dependency petition on Minor's behalf based on Mother's conduct.[1] In a detention/jurisdiction report filed March 4, 2024, the Bureau reported that Mother refused to provide information about Minor's father, and his whereabouts were unknown. The juvenile court detained Minor and ordered services and visitation for Mother.

In a disposition report filed in May 2024, the Bureau reported that a social worker learned Father's name and date of birth (he was born in 1963) from Minor's birth certificate. Father had a criminal history in California going back to 1982, including multiple convictions for vehicle theft, burglary, and drug possession for transport or sale.

In April 2024, the Bureau social worker tried to contact Father at addresses and telephone numbers in Washington state. In May, Lizzy Deschane, a treatment coordinator at King County Drug Court (drug court) in Seattle, Washington, contacted the social worker and facilitated a call with Father. Father told the social worker he was not present at Minor's birth, and he believed his signature was forged on hospital documents. He did not know whether he was the father of Minor but stated he was willing to take

---

[1] Mother is not a party to this appeal. We discuss aspects of the case involving Mother only as relevant to Father's appeal.

2

responsibility for Minor if Minor turned out to be his son. Father admitted he struggled with substance abuse in the past, and he last used drugs in August 2022. Father graduated from a drug court program in Seattle in 2018. His treatment coordinator, Deschane, reported that Father had been doing well until the pandemic in 2020, when he was laid off, causing him to spiral back into criminal activity and addiction. Father was arrested in November 2020 for possession with intent to deliver and returned to drug court. He graduated from a drug court program in August 2022 but chose to continue participating in the program. Deschane reported that Father never missed a court hearing, his twice-weekly drug tests have been negative, and he is very committed to recovery. Father believed he needed to stay focused, remain on track, and obtain stable housing.

The Bureau reported that "[i]t has been assessed that although [Minor] has no physical limitations, his mental health requires more insight on what he needs to meet all of his development milestones." Minor was described as "present[ing] with impulsive behaviors where he will throw himself down to the ground if he does not get what he wants, hit others, or throw things." Minor's resource parent found it difficult to care for Minor "due to his unique behavioral problems" and requested that he be removed from her home. The resource parent observed that Minor broke things when upset, and, on one occasion, he kicked another child in the face when that child no longer wanted to play. Minor was placed in a different resource family home.

On May 20, 2024, Father appeared at a juvenile court hearing by Zoom and requested a paternity test, which the court ordered. At a hearing on jurisdiction held July 15, the juvenile court sustained the allegations in the

3

petition regarding Mother under Welfare and Institutions Code section 300, subdivision (a) (serious physical harm).[2]

Genetic Testing Confirms Paternity, July 2024

Father submitted to genetic testing in June 2024, and on July 17, the Bureau received results showing a 99.9 percent probability he was Minor's father. Father told a Bureau social worker he would like to have the opportunity to be a parent to Minor, and he requested to have his status raised to presumed father.

In August 2024, Father began having telephone/video calls with Minor one or two times a week. The calls did not last long because Minor did "not have the capacity to remain on a telephone call for a long period of time" and had "limited communication skills." In October, it was reported that Father had not had phone calls with Minor for a few weeks "because he 'has been busy' trying to get his housing together." Father was living in transitional housing, and children were not allowed to reside at the facility. Father "stated that he had a bad life in California, and he is not interested in relocating to the area," but he was not "opposed to visiting [Minor] once a month." He also "stated that he would like to have custody of the child once he is able to obtain stable housing." The Bureau reported that, if the court elevated Father to presumed father status, it would provide family reunification services "and request that he engage in a Parenting class to address [Minor]'s mental and emotional health, and educational circumstances, and submit to on-demand drug testing."

---

[2] Undesignated statutory references are to the Welfare and Institutions Code.

Services Ordered for Father, October 2024

At a contested hearing on disposition held October 21, 2024 (contested by Mother), the juvenile court adjudged Minor a dependent of the court. The court ordered appropriate services for "the child and parents in order to help the child return home" and informed the parents that if they were unable to take custody of Minor within 12 months, the court could make a permanent plan for Minor.[3]

In a status review report filed in April 2025, the Bureau recommended the court order an additional six months of family reunification services for Mother and Father. Father was living in transitional housing in Seattle similar to a sober living environment. He volunteered at "a clean and sober facility" and worked in janitorial maintenance in the afternoons and evenings. Father was "diligent in responding promptly to th[e Bureau] social worker," he completed an early childhood parenting class in January 2025, and he reported that he sees a therapist weekly. Father also drug tested twice a week through the drug court, and his results were always negative.

Video visits between Father and Minor resumed in December 2024, and Father attended 11 of 15 possible visits.[4] In recent visits, Father ended the call after 30 minutes due to time constraints with his job, although the visits were scheduled for an hour. The video visits were "generally characterized by loving, playful interaction between [F]ather and son." The Bureau offered to cover the cost of airfare for Father to visit Minor in person once a month, and

---

[3] Although the court ordered services for Father, it did not designate him a presumed father at this hearing.

[4] Two additional scheduled visits did not occur because the foster caregiver was unprepared. As to these missed visits, makeup sessions were offered to Father, but he did not follow up.

a social worker "strongly encouraged [Father] take advantage of this privilege." Father told the social worker he was coordinating a visit to Minor with his (Father's) sister, who lived in Los Angeles.

The Bureau noted that Father had "not yet obtained housing that can accommodate having his son in his care, nor has he established a meaningful enough relationship with [Minor] to this point," and concluded, "At the current time it would be inappropriate to return [Minor] to the care of either of his parents." It was evident "that [Father] is genuine in his intention to be a responsible, caring father for his son," and the Bureau was "hopeful that he will be more consistent with video visits and take advantage of his opportunity to have in-person visits with [Minor] on a monthly basis."[5]

At a combined six-month and 12-month review hearing on April 21, 2025, the juvenile court found Father had made substantial progress and ordered continuation of his reunification services. Services for Mother were terminated.

<u>18-Month Status Report and Memo, August and October 2025</u>

In a status report prepared in August 2025 for the 18-month permanency review hearing, the Bureau recommended the court terminate Father's services and order that Minor "remain in foster care with a goal of

---

[5] As to Minor, the Bureau reported that he had an Individual Education Plan (IEP), and he had been diagnosed with autism spectrum disorder in March 2024, but a doctor who evaluated him in March 2025 suggested he did not have autism but may have attention deficit/ hyperactivity disorder (ADHD). The foster caregiver reported that Minor could be disrespectful and fussy and his "peculiar symptoms" included pacing, walking in circles, and talking to imaginary friends.

placement with a fit and willing relative."[6]  The Bureau also requested a transfer of educational rights to the caregiver, explaining this would ensure Minor's IEP and "developmental related services are attended to in a prompt manner," given Father's "geographic distance, struggles with technology (i.e., completing electronic signatures without the help of his Case Manager), and recent decline in timely correspondence."

It was reported that Father continued to live in transitional sober living housing and to work with his Seattle-based case manager Deschane. In June 2025, Deschane reported that Father " 'is connected to a program that helps single-parent families gain stability, including housing.' " (Italics omitted.)  In August, Father mentioned that he had begun working with a case manager at a local Catholic Community Services (the program Deschane referred him to) to find independent housing.  Since June, he was employed full time doing custodial work.

During the reporting period, Father was much less communicative with the Bureau social worker than previously.  Father "rarely responded [to] attempts to reach him."  In May 2025, the social worker provided Father and Deschane information on parenting classes in Seattle that were tailored to parenting children with special needs.  In July, Father stated he would not be

---

[6] During the reporting period, Minor had changed foster homes twice, first due to "the marginal quality of care [he] was receiving in the home" and later "due to [Minor]'s behaviors both in the home and in public," including "multiple incidents of physical contact with other youth [that] proved to be too much for the caregiver to handle."  It was reported that Minor "exhibited various tantrum behaviors and was sent home from school multiple times," including an incident during which Minor scratched a teacher, threw chairs, and flipped tables.  However, after Minor started taking medication in June 2025, his "focus and behavior improved dramatically."  Minor had weekly sessions with an in-home behavioral support counselor and with a mental health clinician and mental health specialist.

able to attend class because of scheduling issues.  The Bureau social worker spoke with a supervisor and Catholic Community Services to help arrange a parenting class for Father.  As of August 2025, Father had completed orientation for a class and was planning to take 16 weeks of the class.

In April 2025, Father traveled to visit Minor in person, and Father's sister and her daughter also attended.  Father and his relatives had a four-hour visit with Minor, which the Bureau described as generally "a positive experience for all involved."  The next day, they had a six-hour visit, after which the social worker emphasized to Father "the importance of coming down to visit his son and spending time with him" as "bonding with his son and getting acclimated to dealing with his energy and tantrums is crucial." (Italics omitted.)

Father attended 13 of 19 scheduled video visits.  Minor's in-home behavioral support counselor reported that Father " 'gets frustrated doing visits, and gives up quickly.' "  (Italics omitted.)  Social workers suggested multiple times that Father incorporate reading books and activities in the video visits, but he had not followed these suggestions, and it was observed that there was a "decline in the quality of [Father]'s visits."

The Bureau noted Father had not secured stable housing where Minor would be allowed to reside with him, and he had "not spent more than a total of 10 hours in [Minor]'s presence, nor had [Minor] in his care overnight." Father "has no actual experience caring for the young boy," who "requires a great deal of focused, trauma-informed care and attention."  "At various times during the latter part of the reporting period, [Father] . . . reported feeling overwhelmed by his situation, expressing stress over his housing, employment, and the Bureau urging him to see his son."  In August 2025, Father "spoke at length about his frustration related to 'this whole thing,'

and referencing that he did not know he was a father until after his son was born, th[e] fact that his son has been in foster care, and his belief that he has not been given enough time to get his affairs in order to reunify with his son." (Italics omitted.)

The Bureau "regret[ted] that [Father] has not been able to make more substantial progress toward reunifying with [Minor]." Father "has not prioritized [either] visiting his son . . . [or] establishing independent housing." Father has "not explored local financial resources to support housing, as discussed with him by his [Seattle-based] Case Manager and [the Bureau] Social Worker."

On August 25, 2025, Father requested a contested hearing.

In a memo prepared on October 1, 2025, the Bureau continued to recommend termination of Father's reunification services. Minor's behavior continued to be a concern; Minor had been suspended from school for a total of eight days for incidents of hitting and kicking students, biting teachers, spitting on others, and general emotional dysregulation; and he had moved to a new foster caregiver at the previous caregiver's request.

In September 2025, Father told the social worker "he had been looking into potential studio or one-bedroom apartments, but also said, 'I'm not trying to make a move too fast.'" (Italics omitted.) Father attended two of four offered video visits, and he had one in-person visit in September which occurred only after Father was "admonished by his sister on the matter."[7] At

___

[7] The Bureau reported that, in a phone call in September 2025, Father's sister asked the social worker if Father had talked about seeing Minor again after the April visit. When the social worker told her that Father had been encouraged repeatedly to come for another in-person visit but had not done so, Father's sister "stated that she would immediately contact [Father] after the call and would make sure he contacts this Social Worker about visiting

9

the in-person visit, Minor "sprinted into his dad's arms," and an observer noted that Minor "formed long sentences with his father and engaged in lengthy talks, smiling each time." Father had attended eight weeks of parenting class, and the class facilitator reported that Father was "working hard and making steady progress." (Italics deleted.)

The Bureau was "pleased that [Father] has been positively and actively involved in his parenting class" but "regret[ted] that [Father] had not prioritized visiting his son." It further noted that "the quality of engagement of virtual visits has declined since the initial reporting period despite the Bureau's efforts to support [Father] in this regard."

Contested 18-Month Review Hearing, October 2025

At the contested 18-month permanency review hearing on October 6, 2025, there was no witness testimony, and the juvenile court heard counsels' arguments.

Minor's counsel supported the Bureau's recommendations. Counsel appreciated Father's efforts and described him as "steady and present throughout the case," but, she said, Minor "is a child with exceptional special needs," and, "I'm sad to say that I don't think more time is going to help us to reunify Father and [Minor]." She observed that, if the Bureau's offer to pay for airfare "doesn't get the father in person with his son, then I don't see how we could even contemplate . . . placing [Minor] with Father, given the limited in-person contact they've had."

---

[Minor] again." In the August 2025 status report, the Bureau noted that Father's sister "has in fact been more proactive in communicating with this Social Worker and asking about [Minor] than [Father] has been during the reporting period."

Father's counsel acknowledged that it is "very rare" to extend services beyond 18 months, but she argued it was warranted in this case because the matter was not being set for a permanent placement hearing and because Father only received services for a year (from disposition on October 21, 2024, to October 6, 2025). She argued that Minor "has extraordinary needs and would benefit from any possible support" and an "additional six months of services for father could really change [Minor]'s life." Father's counsel did *not* argue that additional services were required or warranted on the ground that the Bureau's services thus far had been inadequate.

County counsel responded that extending services for 24 months requires "exceptional circumstances" and a finding "by clear and convincing evidence that some very specific characteristics apply to the case, none of which apply to Father . . . ." County counsel noted this was not a case where reasonable services were not provided. She argued the Bureau "made every effort to assist the Father, indicating that we would pay for a ticket once a month, that the social worker would personally pick the father up from the airport and drop him off so there would [be] no additional cost to him," and the Bureau "social worker has worked with father's case manager up in Washington," "[b]ut the father has not been consistent in responding to the social worker to set up the visits."

Court Ruling

The juvenile court followed the Bureau's recommendations and terminated Father's reunification services. The court observed that the Bureau "really went to extreme measures by . . . agreeing to pay for airfare to get Dad down here once a month to visit with this son. And for whatever reason, Father did not take full advantage of that offer." It further noted that Minor "has extreme needs," Father "was a noncustodial parent for

11

almost the entirety of [Minor]'s life," and "much of the quality of th[e video] visits, in the Court's view, is rather poor or minimal."

The court explained: "[I]t does not appear to the Court appropriate to extend services to 24 months. [¶] And even if the Court were to do so, it does not appear to the Court that there's a substantial probability that [Minor] would be placed in the care of [Father] if the Court were to extend services . . . to 24 months. [¶] And I also don't think that the Court could say there's been consistent progress in court-ordered services. There's been some, but not a good deal of progress. Much of that is [Minor]'s very special needs and Dad just being unable to meet those needs . . . ."

The court recognized that Father "expressed a commitment to [Minor] through this process and these court proceedings" and that Minor calls him dad and has affection for him. The court believed it was "really important for [Minor] to have [Father] in his life at some level" and expressed hope that Minor could be placed with Father at some point.[8] The court ordered weekly video visits and allowed Father in-person visits.

The court limited Father's (and Mother's) right to make education decisions for Minor, and designated Minor's current caregiver as the educational rights holder. But it also ordered the Bureau to "keep [Father] apprised in a timely fashion [of IEP meetings] so he can make arrangements to participate in those meetings."

The court did not set a section 366.26 hearing.

---

[8] After adopting the Bureau's recommendation to continue Minor in foster care with the goal of placement with a fit and willing relative, the court stated, "Hopefully, at some point, that would be [Father]."

**DISCUSSION**

A.    *Reasonable Services*

"For children over the age of three on the date of initial removal, the presumptive period of [family reunification] services is 12 months." (*B.D. v. Superior Court* (2025) 110 Cal.App.5th 1132, 1150, citing § 361.5, subd. (a)(1)(A), (3).)  Generally, court-ordered services may be extended only up to a period not exceeding 18 months after the date the child was originally removed.  (§ 361.5, subd. (a)(3)(A).)

When a dependency case has been continued for additional services, a "permanency review hearing shall occur within 18 months after the date the child was originally removed from the physical custody of their parent or legal guardian." (§ 366.22, subd. (a)(1).)  At the 18-month permanency review hearing, "if the child is not returned to a parent . . . and the court finds that reasonable services have not been provided . . ., the court shall extend reunification services for an additional six months.  (§ 366.22, subd. (b)(2).)

Father contends the juvenile court erred in denying his request for additional services because he did not receive reasonable services.

1.    Applicable Law and Standard of Review

"The 'adequacy of reunification plans and the reasonableness of the [Bureau's] efforts are judged according to the circumstances of each case.' [Citation.]  To support a finding reasonable services were offered or provided, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult. . . .' [Citation.]  'The standard is not whether the services provided were the best that might be provided in an

13

ideal world, but whether the services were reasonable under the circumstances.' " (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426.)

"When we review a sufficiency of the evidence challenge, we may look only at whether there is any evidence, contradicted or uncontradicted, which supports the trial court's determination. We must resolve all conflicts in support of the determination, and indulge in all legitimate inferences to uphold the court's order. Additionally, we may not substitute our deductions for those of the trier of fact. [Citations.] And, in reviewing the reasonableness of the reunification services provided by the Department, we must also recognize that in most cases more services might have been provided, and the services which are provided are often imperfect. The standard is not whether the services provided were the best that might have been provided, but whether they were reasonable under the circumstances." (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.)

2.     Analysis

Father contends the Bureau did not provide reasonable services because it "did nothing to help him gain [proper] housing."

As a preliminary matter, Father asserts the juvenile court made no "express finding on the record" that reasonable services were provided. As respondent points out, however, the court signed written "findings and orders after 18-month permanency hearing," which specified that the court found "by clear and convincing evidence that the county agency has complied with the case plan by making reasonable efforts to return the child to a safe home through the provision of reasonable services . . . ." In juvenile dependency proceedings, "the written order controls." (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 756, fn. 1.) To the extent Father claims either that the

14

juvenile court was required to make a finding of reasonable services orally or that it was required to identify evidence in support of its finding, such a claim is forfeited both because he has not provided any supporting argument or legal authority and because he failed to raise such objection at the 18-month permanency hearing and, indeed, counsel "waive[d] further reading [of the Bureau's recommendations] and any irregularities as [the court] adopt[ed] and incorporate[d] the recommended findings."  (See *In re A.C.* (2017) 13 Cal.App.5th 661, 672–673 [mother forfeited arguments by failing to cite any cases or other authority; " '[a]ppellate briefs must provide argument and legal authority for the positions taken' "]; *In re Dakota H.* (2005) 132 Cal.App.4th 212, 222 [forfeiture "applies in juvenile dependency litigation and is intended to prevent a party from standing by silently until the conclusion of the proceedings"].)

Father's case plan called for Father to complete parenting class, "demonstrate the ability to meet the emotional needs of the child," "[s]upport [Minor]'s educational success," and submit to drug testing.  As respondent notes, Father never argued to the juvenile court that the Bureau failed to provide him reasonable services.  Nor does the record indicate that Father ever asked the Bureau to help him find housing.

If Father "felt during the reunification period that the services offered . . . were inadequate, [he] had the assistance of counsel to seek guidance from the juvenile court in formulating a better plan: [¶] ' "The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them.  If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few

15

judgments would stand the test of an appeal." ' " (*In re Christina L.* (1992) 3 Cal.App.4th 404, 416.)

Here, the record supports a finding the Bureau made "made a 'good faith effort to develop and implement a family reunification plan' [citation] and thereby satisfied its statutory duty." (*In re Christina L.*, *supra*, 3 Cal.App.4th at pp. 417–418.) The Bureau offered services and maintained contact with both Father and his Seattle-based case manager, and made reasonable efforts to assist Father in developing a relationship with Minor—a child Father never acknowledged was his son until after this dependency case began. The Bureau offered to pay for Father to fly from Seattle to visit Minor every month, and the social worker strongly encouraged Father to do so. The social worker pointed out to Father on multiple occasions that the visit could be done in one day, and offered to personally transport Father to and from the airport, eliminating another expense. After April 2025, Father became much less responsive to the Bureau social worker, "rarely respond[ing to] attempts to reach him." The social worker continued to try to contact Father and maintained communication with his case manager. The social worker provided information on classes for parenting children with special needs in Seattle; he also confirmed with both Father and his Seattle-based case manager that Father was connected to, and working with, a program that helped single-parent families with housing.

On appeal, Father suggests the *only* reason he was unable to take custody of Minor was that the Bureau failed to provide reasonable services by not helping him obtain suitable housing, ignoring the facts that he had no experience caring for Minor and that Minor has exceptional special needs. The record belies Father's portrayal of the circumstances of this case. Instead, the record shows the Bureau and Minor's counsel were concerned

16

that Father had not spent enough time with Minor to establish a bond. (Recall that the social worker repeatedly encouraged Father to visit Minor in person because "bonding with his son and getting acclimated to dealing with his energy and tantrums [was] crucial," and Minor's counsel could not contemplate placing Minor with Father, "given the limited in-person contact they've had." (Italics omitted.))

As for help with obtaining suitable housing, the Bureau was aware that Father was working with a program intended to help single parents with housing, but, in September 2025—more than 13 months after paternity was confirmed—Father told the Bureau social worker he was "not trying to make a move too fast" in connection with moving from sober living transitional housing to an apartment where Minor could live with him. Respondent argues Father "demonstrated no urgency regarding reunification with his son," and the record supports this conclusion. "The requirement that reunification services be made available to help a parent overcome those problems which led to the dependency of his or her minor children is not a requirement that a social worker take the parent by the hand and escort him or her to and through classes or counseling sessions." (*In re Michael S.* (1987) 188 Cal.App.3d 1448, 1463, fn. 5.) In the present case, we do not believe the Bureau social worker was required to take Father by the hand and escort him through the process of moving from sober living to an apartment. "Reunification services are voluntary, and cannot be forced on an unwilling or indifferent parent." (*In re Jonathan R.* (1989) 211 Cal.App.3d 1214, 1220.)

In sum, the record supports the juvenile court's finding that reasonable services were provided under the circumstances.

B.    *The Decision Not to Exercise Discretion to Continue Services*

Father also asserts the juvenile court should have continued services as a matter of discretion under section 352. However, he fails to demonstrate the juvenile court abused its discretion in declining to do so. (See *In re D.N.* (2020) 56 Cal.App.5th 741, 756 [denial of a request for continuance of a hearing under section 352 is reviewed for abuse of discretion; " ' "[d]iscretion is abused when a decision is arbitrary, capricious or patently absurd and results in a manifest miscarriage of justice" ' "].)

As we have just discussed, this is not a case where the parties agree that the lack of suitable housing was the only barrier to placing a dependent child with a non-offending parent. Father's reliance on *In re D.N.*, *supra*, 56 Cal.App.5th 741, is therefore unavailing. In *D.N.*, the father did not have suitable housing because he was indigent, the parties agreed that lack of housing was the only barrier to placing the child with the father, and the juvenile court found the "father made 'sincere' efforts to find suitable housing and otherwise substantially complied with his case plan." (*Id.* at pp. 763–766.) Here, in contrast, the juvenile court did not mention the lack of suitable housing in denying Father continued services. Rather, the court cited Father's lack of consistent progress in court-ordered services, finding that Father failed to have consistent and regular visitation (either video or in person) and that Father did not "demonstrate he's able to meet [Minor]'s extraordinary needs." The court found Father's progress over the reporting period "minimal," not substantial.

Father does not challenge the juvenile court's factual findings that he failed to have consistent visitation with Minor and failed to demonstrate he is able to meet Minor's extraordinary needs. On this record, Father has not

shown the juvenile court abused its discretion in denying his request for continued services.

C.     *Termination of Education Rights*

Finally, Father contends the juvenile court abused its discretion in limiting his education rights.

In its October 2025 memo described above, the Bureau wrote that transferring educational rights to the caregiver would avoid "delay in attending to IEP and other school related matters for" Minor.  The Bureau reported that Father's "work schedule and lack of proficiency with technology have led to delayed school-related documents being signed and services implemented."  School staff reported that obtaining Father's signature contributed to delays in formalizing Minor's IEP in January 2025; in the current school year, school staff were unable to hold "an immediate emergency school meeting to address [Minor]'s behavior" because of the need for a signature from the educational rights holder; and there were similar issues in August 2025.

At the contested hearing, Father's counsel asked the court to "allow [Father] to share educational rights."  Minor's counsel supported changing the educational rights holder as recommended by the Bureau but requested that Father "be kept in the loop" in case "Father gets himself a stable place to live and visits more frequently in person."  The court followed the Bureau's recommendation and Minor's counsel's request.

1.     Applicable Law and Standard of Review

"Parents have a constitutionally protected liberty interest in directing their children's education.  [Citations.]  However, when a child is a dependent child, a court may limit a parent's ability to make educational decisions on

19

the child's behalf by appointing a responsible adult to make educational decisions." (*In re R.W.* (2009) 172 Cal.App.4th 1268, 1276.)

"If the parent or guardian is unwilling or unable to participate in making an educational decision for their child, or if other circumstances exist that compromise the ability of the parent or guardian to make educational decisions for the child, the county welfare department or social worker shall consider whether the right of the parent or guardian to make educational decisions for the child should be limited." (§ 366.1, subd. (e).) "The limitations may not exceed those necessary to protect the child. If the court specifically limits the right of the parent . . . to make educational or developmental services decisions for the child, . . . the court shall at the same time appoint a responsible adult to make educational or developmental services decisions for the child . . . ." (§ 361, subd. (a)(1).)

"All educational decisions must be based on the best interests of the child." (*In re Samuel G.* (2009) 174 Cal.App.4th 502, 510.) "The educational representative's responsibilities include participating in and making decisions regarding all matters affecting the child's educational needs in a manner consistent with the child's best interests." (*Id.* at p. 510.)

"We review the juvenile court's order limiting parents' educational rights under an abuse of discretion standard [citation], bearing in mind '[t]he focus of dependency proceedings is on the child, not the parent.'" (*In re R.W.*, *supra*, 172 Cal.App.4th at p. 1277.) " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)

20

2.  Analysis

Father argues the juvenile court abused its discretion because there was no reason he could not share rights with the caregiver.

Here, over the course of the dependency, the Bureau documented Minor's extensive difficulties at school, including episodes of "various tantrum behaviors" that resulted in him being "sent home from school multiple times." Minor had multiple diagnoses and an IEP. The record further shows that, by May 2025, Father was "rarely respond[ing]" to the Bureau's attempts to reach him. Father's inability to timely sign school-related documents caused delays in Minor's services and delays in the school responding to Minor's behavior. On this record, we cannot say the juvenile court's decision to limit Father's educational rights and appoint a responsible adult to make educational decisions for Minor exceeds the bounds of reason.[9]

**DISPOSITION**

The juvenile court's findings and orders are affirmed.

---

[9] Father suggests the juvenile court could and should have assigned educational rights to a third party without limiting his own educational rights, so that the rights would be shared between him and a foster caregiver. Respondent responds that no provision of the Welfare and Institutions Code or the California Rules of Court authorizes a joint decisionmaker on educational issues in this manner. We need not resolve this issue because regardless of whether it might be permissible to have joint educational rights held by a parent and an unrelated responsible adult, we see no abuse of discretion in this case. The court acted within its discretion because there was evidence Father appeared to be "unwilling or unable" to make educational decisions in a timely manner. (See *In re Samuel G., supra*, 174 Cal.App.4th at p. 510 ["The court has the authority to limit the right of a parent to make educational decisions for a dependent child of the court if it appears the parent is unwilling or unable to do so"].)

21

_____

Miller, J.

WE CONCUR:


_____

Stewart, P. J.


_____

Desautels, J.


A174548, *Contra Costa County Children and Family Services Bureau v. Anthony J.*